## PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT

I, Evan Hendricks, provide the following Expert Report pursuant to Federal Rules of Civil Procedure 26(a)(2) in connection with the action entitled <u>Gail Cope v. MBNA American Bank NA</u>: U.S. District Court for the District of Oregon; No. 04-CV-493-JE. If appropriate, I can supplement this report if additional evidence becomes available.

**1.     Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (Privacy Times 2004), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (Privacy Times 2004). The book has 22 Chapters, 359 pages and 369 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of <u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

EXHIBIT 25
Page        of

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified before Congress on numerous occasions – always by invitation. On July 20, 2005, I testified before the House Financial Services Subcommittee on Oversight. The hearing focused on recent breaches of data security, and their impact on data security, privacy and accuracy. On March 15, 2005, I testified at the Senate Banking Committee's hearing, "Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information."[1]

In 2003, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security. The following are the titles and dates of only the 2003 hearings in which I testified, or in the case of the FTC, presented:

> "The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003

> "The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003

> "Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003

> "Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003

> "Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

---

[1] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

I regularly present Continuing Legal Education or professional seminars related to the FCRA, including Glasser LegalWorks (Sept. 2004), Privacy and American Business (Feb. 2004), and the National Credit Reporting Assoc. (Nov. 2004). In 2005, I'm scheduled to present at FCRA-related seminars sponsored by the Practicing Law Institute and Texas Bar Association.

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. The Council meets twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

## 2.    Testimony And Expert Reports

Within recent years, I have testified in trial, deposition and/or provided an expert report in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird qualified me to testify about CRA procedures and their impact on the consumer, and the nature of identity theft. The U.S. Court of Appeals for the Ninth Circuit ruled

that Judge Baird overly limited the scope of my testimony, specifically finding that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE. FCRA. Expert report, deposition, trial testimony.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection).

Doris M. Gohman v. Wells Fargo & Co., et al: U.S. District Court for the District of Minnesota, Case No. 03-6442.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Jessica Marie Rivera, v. Americas Recovery Network, Inc., et al: U.S. District Court for the District of Minnesota, Case No. 04-904 JRT/FLN.  Expert report.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Matthew Kirkpatrick. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 02-1197-MO. Expert report. Deposition

Ronald L. Bishop v. U.S. Bancorp: U.S. District Court for the District of Nevada; No. CV-S-02-0150-LRH-PAL. FCRA. Expert report.

Victoria Apodaca v. Discover Financial Services & Equifax Credit Information Services, et al.: U.S. District Court for the District of New Mexico; No. CIV 04-0717/WDS. Expert report.

4

Clayton Glatt, et al. v. PMI Group, Inc., et al: U.S. District Court – Middle Dist. of Florida (Ft. Myers Div.) – No. 2:03-cv-326-FtM-29SPC. FCRA. Expert report.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div. FCRA. Expert report. Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438. FCRA. Expert report. Deposition

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433. FCRA. Expert report, deposition.

Carlos A. McCue, Jr. v. Experian Information Solutions, Inc., et al: U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. 1:04CV652. Expert Report.

Linda Johnson v. Trans Union, LLC. & Equifax Information Services, L.L.C., et al: U.S. District Court for the Eastern District of Virginia (Richmond Div.). Expert Report.

Thomas E. Payne, Jr. v. Equifax Information Services, L.L.C., and Credit Adjustment Bd, Inc.: U.S. District Court for the Eastern District of Virginia (Richmond Div.). Expert Report.

Douglas Kopel v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Virginia, No. 3:04CV648.

James N. Bumbalough, et al. v. Union Savings Bank: U.S. District Court for the Southern District of Ohio (Western Div); Civil Action No. C-3-02-333. FCRA, tort. Expert Report.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE. FCRA. Expert reports.

Cheryl Beach, et al. v. Bank of America Corp., et al.: Superior Ct. of California (Alameda Cty). No. 2002-054356. Declaration.

Jerome Beacham v. Informative Research et al., U.S. District Court for the Eastern District of Michigan (Southern Division), Civil Action No. 01-60247. FCRA. Expert report.

Scott D. Lewis v. Ohio Professional Electronic Network, LLC, et al.: U.S. District Court for the Southern District of Ohio (Eastern Div); Case No. C2-00-1131. FCRA. Expert report.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. Expert Report.

Kathleen A. Genera and Joseph P. Genera v. Trans Union (of Delaware) LLC, et al., U.S. District Court for the Southern District of New York; Case No 01 Civ. 5556 (AGS)(FM).

FCRA. Expert Report.

Carol Fleischer v. Trans Union, et al. U.S. District Court for the Eastern District of Michigan (Southern Div); Case No. CV 02-71301. FCRA. Expert Report

Jason Turner v. Equifax Credit Information Services, Inc.: U.S. District Court for the Northern District of Alabama (Southern Div); Case No. CV 02-J-0787-S. FCRA. Expert Report.

Mary M. Harris v. Equifax Information Services, L.L.C: U.S. District Court for the Southern District of Texas (Galveston Div.); Civil Action No. 02CV753. FCRA. Expert Report.

Arlan C. Woods, Jr. v. Portfolio Recovery Associates, L.L.C: U.S. District Court for the District of Montana (Butte Division); Civil Action No. 02-61-BU-SEH. FCRA. Expert Report.

**3.    Fee**

My fee is $250 per hour for preparation and for consulting; $250 per hour, or a minimum of $1,000 per day, for deposition or trial testimony, plus reasonable travel time, plus travel costs and expenses.

**4.    Potential Areas Of Testimony**

At this point in time, to a reasonable degree of professional certainty, I hold the following opinions in the case entitled Gail Cope v. MBNA American Bank NA. Before discussing opinions specific to this case, I first will provide foundational topics and general opinions which also could be help the trier of fact understand the issues in this case. These topics include the nature and purpose of credit reports and credit scores, the history of mixed files and identity theft and their impact on credit report accuracy, and the evolution of the role of furnishers such as MBNA in credit reporting and under the FCRA. Because of the nature of this case, the need for details makes this report rather lengthy.

*For a summary of my opinions, please see page 19.*

**A. Nature & Purpose Of Credit Reports**

While there is growing public awareness about the credit reporting system, public awareness is by no means universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports. Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

Therefore, it is important that the trier of fact have an accurate understanding of the nature and purpose of consumer reports, how to read and comprehend them, and the system that generates them. Accordingly, a brief description of the consumer report is fundamental to my opinion in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)     A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.
(2)     A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.
(3)     If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.
(4)     A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

## B. Nature & Purpose of Credit Scores

A credit score is a number that reflects a consumer's creditworthiness at a given point in time. The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union,[2] are based upon the FICO model. The higher the credit score, the less risky the consumer

---

[2] Until recently, the Trans Union FICO score was called "Empirica"

is viewed by creditors. Consequently, consumers with the higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

For example, on a $150,000 30-year, fixed-rate mortgage, a consumer with a 720 score might pay a 5.6% interest rate with a monthly payment of $861, while a consumer with a 619 score would pay an 8.53% rate with a monthly payment of $1,157. The difference in payment is $296 per month, or $3,552 per year. For major credit transactions like mortgages or refinancing, too low of a FICO score can disqualify consumers for most, if not all, loan packages. Similarly, the existence of certain types of derogatory information in the credit report, including unpaid bills or collections, can make the consumer ineligible for major credit.

Like credit reporting, there is low public awareness about credit scoring. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

> Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates. http://www.consumerfed.org/092104creditscores.PDF

## C. Historical Background: CRAs & Mixed Files

There is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, various non-industry studies have concluded that credit report inaccuracy is a significant problem. In the early 1990s, the leading cause of complaints to the Federal Trade Commission (FTC) was credit bureaus and credit reports. Specifically, consumers complained about inaccuracy, CRA non-responsiveness, inadequate reinvestigations and reappearance of previously deleted data. These complaints resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files, being more responsive and conducting adequate reinvestigations. On June 22, 1992, Equifax signed an "Agreement of Assurances" with 18 State Attorneys General (AGs). On October 26, 1992, Trans Union signed a Consent Order, consisting of similar definitions and goals with the same 18 State Attorneys In 1994, Equifax signed an "Agreement Containing Consent Order To Cease and Desist" with the FTC.

The first problem identified by the 1992 State AG Agreements was the need to avoid the occurrence or reoccurrence of mixed files. The Agreement defined "Mixed File" as a "Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report." The 1994 FTC Consent Order's definition of Mixed File was identical. The Agreement also emphasized the importance of using

8

"full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

The 1994 FTC Consent Order also emphasized the prevention of mixed files. In highlighting the need for adequate reinvestigations, the Order stated that such reinvestigations shall include…:

> … Accepting the Consumer's version of the disputed information and correcting or deleting the disputed information, when the Consumer submits to Equifax documentation obtained from the source of the information in dispute which confirms that the disputed information on the Consumer Report was inaccurate or incomplete …

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations and reappearance did not go away. Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations. This resulted in the 1996 legislative amendments to the FCRA.

## D.  History: Identity Theft

Another problem that poses a direct threat to the accuracy and integrity of personal data held by CRAs is identity theft. Identity theft occurs when an imposter steals a consumer's identity, usually through the use of the consumer's Social Security number, to exploit the innocent consumer's credit-worthiness. Identity theft is a sub-category of the more general category of Mixed Files in the sense that the imposter-generated fraudulent activity is mixed into the consumer report of the innocent victim. Various research reports and statistics from the FTC, the U.S. General Accounting Office and others have confirmed that identity theft has steadily escalated. Because this does not appear to be an identity theft case, a lengthy history and analysis of identity theft is not necessary. But it is important to understand that identity theft is similar to a Mixed File in the sense that often the most profound damage to the consumer is the impact on the credit report, both in causing unjust denials of credit, and forcing the consumer to invest the time and energy, and experience the stress, of fixing credit report errors that were not of her making. Thus, the prevalence of identity theft reminds furnishers such as MBNA of the importance of conducting adequate investigations, and of the likely damage to consumers if they fail to do so

## E.  History: Furnishers (MBNA)

The FCRA first imposed reinvestigation duties on furnishers in 1997 when the 1996 legislative amendments took effect. That legislation was several years in the making, and nearly passed Congress in 1994.

Accordingly, the April 1994 House Banking Committee Report on the proposed amendments explained why, despite the above cited consent agreements, and subsequent

industry guidelines, legislation was necessary:

> "Because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. *Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors."* [Emphasis Added]

Thus, furnishers such as MBNA have been on notice for nearly 10 years of the importance of adequate reinvestigations to consumers and the accuracy of their credit reports.

In the course of the 2003 legislative hearings of the FCRA amendments that came to be known as the FACT Act[3], several witnesses, including myself, testified that the reinvestigation procedures of furnishers in general, and of MBNA in specific, were inadequate, as summarized below.[4]

I followed up with a letter to MBNA and the three major CRAs, advising them of the inadequacies of MBNA's reinvestigation procedures, and urging them to make changes (pertinent portions of the letter are quoted below). I have not yet seen any evidence that MBNA has significantly improved it procedures for investigating consumer disputes.

**F.    MBNA Often Does Not 'Investigate' Disputes**

A general problem with MBNA's procedures and practices is that they do not facilitate true investigations of consumer disputes. In previous cases, CRAs and MBNA have testified that their "investigations" consist of an exchange of Consumer Dispute Verifications (CDVs). These "investigations" generally rely on the response of the furnisher in deciding whether to permit disputed data to remain on a credit report. Rather than any party actually investigating, MBNA merely *compares* the disputed data, as set forth in the CDV, to the data about the consumer that it reported to the CRA. In my opinion, however, in more complex cases, like mixed files or identity theft, this practice of *comparing* data is not reasonably calculated to determine the underlying truth of the disputed data – and therefore the genuineness of the consumer's dispute.

My Webster's New Collegiate Dictionary defines the term, "Investigate – v. To observe or study by close examination and systematic inquiry;" and "Systematic—adj. Marked by thoroughness and regularity." In my opinion MBNA's method of exchanging ACDV/CDVs does not amount to an adequate investigation in cases like Mrs. Cope's, in part because it is neither close nor thorough. MBNA was aware of these problems but has declined to alter these procedures.

---

[3] Fairness and Accurate Credit Transactions Act  P.L. 108-159
[4] See Hendricks testimony before House, June 12, 2003, and before Senate, July 10, 2003, op. cit.

Specifically, at MBNA, an "investigation" consists of a *comparison* of the disputed data with information in its database, the Customer Information System (CIS). One of the first cases that brought MBNA's practices to light was that of Linda Johnson. Seeking to collect unpaid charges incurred by her ex-husband, MBNA continued reporting a $17,000 unpaid balance to Linda Johnson's credit report. However, Ms. Johnson was not responsible for the charges. Despite repeated disputes to both MBNA and the CRAs, MBNA conducted the data comparison and then "verified" to the CRAs that the information was correct, which had the effect of keeping it on Ms. Johnson's credit report.

In the Ms. Johnson's case, Tricia Furr, an MBNA credit reporting specialist, testified that MBNA's "Desktop Procedure" manual directs specialists to confirm a match of two out of three identifiers – name, address and/or SSN. Once a two-out-of-three match is established, MBNA can inform the CRA that the disputed information is "verified as reported." Ms. Furr said that MBNA's "reinvestigations" did not go beyond the information contained in its own CIS.[5]

> **Furr**: I looked at the balance that we have on CIS and the history of the account as compared to the trade line as opposed to what we had on our Customer Information screen. . .
> **Bennett**:[6] In performing the investigation and re-investigation of consumer disputes, once it receives an ACDV[7] from a credit reporting agency, when are MBNA's credit reporting specialists supposed to look beyond the Customer Information System for investigation? . . . I am asking the practices and procedures now.
> **Furr**: The Customer Information System is the only thing that we have to use for verification. So, there is no where else to look.
> **Bennett**: *Do you ever pull documents, like old statements, and check payments and credit card applications?*
> *Furr: No, sir.* [Emphasis Added]

The testimony underscored the fact that because MBNA relies on the above-described data-comparison as its principle method of reinvestigation, it does not take other investigative steps that would help MBNA more effectively resolve genuine consumer disputes. These steps could include, for example, reviewing credit applications and/or monthly statements, or calling the consumer making the dispute. (It's worth noting that MBNA or its agents will call customers who are behind on payments, or when they notice suspicious patterns in card usage.)

The shortcomings of relying on the ACDV data-comparisons, and the need to consider other investigative steps, were emphasized in the 2003 Congressional testimony of both Leonard Bennett (Johnson's attorney) and me.

---

[5] The depositions of MBNA personnel were taken in the case, Linda Johnson v. MBNA America Bank, N.A., Slip Op. No. 3:02 cv 523, U.S. District Court For The Eastern District of Virginia (Richmond Division). Ms. Furr's deposition was taken on December 18, 2002. Testimony taken in this case established that this policy and practice has continued. (See page 13).

[6] Leonard Bennett, of Newport News, Virg., represented Ms. Johnson

[7] The dispute form is known as an "ACDV," or Automated Consumer Dispute Verification

In December 2003, I followed up with a letter to MBNA and the three CRAs, advising MBNA of the shortcomings of its ACDV data-comparison approach.

Citing the deposition testimony of MBNA personnel, I wrote:

"In my opinion, the policies and practices described by MBNA personnel will fail to result in adequate reinvestigations of many legitimate consumer disputes and will cause MBNA to "verify" information that is inaccurate, or is incomplete to the extent that it would need to be corrected and/or deleted from a consumer's credit report in order to ensure fairness. These policies and practices will contribute to inaccuracy throughout the credit reporting system, and will also heighten damage to consumers by increasing the amount of time they expend, and emotional distress they endure, attempting to correct inaccuracies. Allow me briefly to explain why.

"It is important that MBNA understand that the *comparison* it currently conducts after receiving a consumer dispute does not amount to an *investigation* and is insufficient in many instances to determine whether a consumer's dispute is valid and whether information would need to be corrected. One such instance would be a mixed files case, in which two consumers' payment histories are merged together for credit reporting purposes because of a similarity in their names and/or SSNs. Although there are no authoritative numbers as to the extent of the mixed files problem, there is ample evidence that it is not uncommon. Another instance would be identity theft, which, in a sense, is a component of the mixed file category (since the activities of the fraudster are mixed into the credit history of the innocent victim). Another instance would be divorce, as was the situation in Ms. Johnson's case. The note on her ACDV said the account "belongs to her husband only," but there was no way for MBNA to properly investigate this dispute and get to the truth because it restricted itself to comparing the ACDV identifiers with Ms. Johnson's identifiers within its own CIS.

"Even within the current system, it appears from the deposition testimony that MBNA credit reporting specialists only consult the CIS's one-page summary screen, not archived, and only as updated, and the list of comments made by MBNA employees on the account over time.

"To conduct an adequate reinvestigation, MBNA would need to take the appropriate *investigative* steps to learn if a consumer's dispute warranted a correction in the data it reported to CRAs. Naturally, the appropriate steps would depend on the circumstance. For starters, it needs to pay close attention to the nature of the dispute and all dispute-related information originally submitted by the consumer to MBNA or to the CRA. In some instances, MBNA might need to check archived material, like original credit applications or payment records. In other instances, it might need to check for similarities in names and/or SSNs that could cause a mixed file. In still others, it would need to know how to assist a customer who has become a victim of identity theft clear up a polluted history. Finally, in

12

some cases, MBNA might be able to clear up an inaccuracy with a quick phone call.

"A second concern regarding accuracy is the volume of consumer disputes and the number of "verifiers" MBNA has to handle the volume. According to the testimony of Ms. Grimes, MBNA has 12 verifiers, each handling about 250 disputes per day. That would mean that MBNA handles approximately 3,000 disputes per day. It would also mean that verifiers must process about 31.25 disputes per hour, leaving them about two minutes per each dispute. In my opinion, this sort of ratio, of number of verifiers to number of disputes, makes it difficult, if not impossible, for MBNA dispute handlers to adequately investigate consumers' legitimate disputes over inaccurate data in their credit reports. The fact they are referred to as "verifiers" reflects the reality that they are expected to verify as much data as quickly as they can – not necessarily to investigate. In my opinion, such a system pressures MBNA personnel into prioritizing the *quantity* of data processed over *data quality* (e.g., accuracy, truthfulness and completeness).

"A third concern is the adequacy of training. It does not appear that MBNA's credit report specialists receive much in the way of formal training. Ms. Furr indicated that she only received "hands on" training, and that MBNA's policy manual only contained a few pages regarding credit reporting and consumer disputes. When Ms. Furr was first asked what kind of training specialists received, she responded, "What do you mean 'training?'" The issue of credit report accuracy, and the factors that can cause inaccuracy (i.e., mixed files, clerical errors, divorce, co-signer arrangements, identity theft), and the relevant standards under FCRA, can be complex. Accordingly, it is important that MBNA personnel responsible for evaluating consumer disputes are adequately trained.

MBNA never responded to my letter. Since I wrote the letter, I have been an expert in other cases in which MBNA's inadequate investigative practices had caused inaccuracies to persist on a consumer's credit report. In my opinion MBNA's has not substantially changed its approach for reinvestigating consumer disputes. Despite the criticism, a central reason that MBNA does not appear willing to alter its principal reliance on the ACDV exchange is that it is a low-cost method of giving the appearance that it investigates consumer disputes.

MBNA's testimony in this case indicates that when responding to a consumer's dispute, it continues to narrowly focus on matching identifiers. (A = MBNA; Q = Plaintiff's counsel)

9  Q.  And so when you receive a dispute that has
10  that language in that, what do you understand to be the
11  nature of the dispute?
12   A.  That the disputing consumer is saying that
13  this account is not his or hers.
14     Q.  All right.  And so what do you understand is
15  the nature of the verification?  What then will you
16  attempt to verify?  What does MBNA attempt to verify

17  then?
18      A.  We will investigate all of the consumer
19  identification.
20      Q.  So this is, as opposed to a payment history or
21  other kinds of things, this is an identification issue?
22      A.  Yes.              [English, pg. 35]

        [Snip]

3       Q.  Now, going down to -- well, you've earlier
4   indicated that, my recollection is, that the Gail Cope
5   matter was what we called an identity or an ID dispute.
6   Correct?
7       A.  ID, yes.
8       Q.  And down at the bottom of document 205, the
9   Roman numeral VI,[8] it talks about processing ID disputes.
10  Correct?
11      A.  Correct.
12      Q.  And so that would be the procedures that one
13  would follow in processing a dispute like the one Gail
14  Cope submitted.  Correct?
15      A.  It would be a guideline.
16      Q.  Okay.  So No. 1 is you compare the ID; that
17  is, the name, address, Social Security number, date of
18  birth, given on the dispute against what is on this, on
19  this CIS.  Correct?
20      A.  Correct.
21      Q.  And we talked about that earlier with respect
22  to Exhibit No. 26.  Right?
23      A.  Yes.
24      Q.  There is kind of the two columns, there is the

1   information on the left-hand side that the credit bureau
2   submitted, and then you compared what was on your screen
3   as to whether it was the same or different?
4       A.  Correct.
5       Q.  And attempted to verify are we talking about
6   the same person?
7       A.  Correct.
8       Q.  And No. 2, you require that two pieces of the

---

[8] Roman Numeral VI refers to the section on "Processing ID disputes," found in Deposition Exhibit 28, "Credit Bureau Management Desktop Procedures,' "CBM # 112: Automated Consumer Dispute Verifications (E-Oscar)." That section specifies that MBNA operators handling consumer disputes are to "(1) Compare the ID (name, address, ssn, dob) given on the dispute against the ID on CIS. (2) Two pieces of ID must match to respond verified as reported." Number (3) allows for the use of "additional tools," but Ms. English's testimony and the CIS screens do not indicate that any additional tools were used in Ms. Cope's case (English, pgs. 151-55).

9  ID must match in order to respond as verified.  Correct?
10      A.  Correct.
11      Q.  So either the name and the birth date or the
12  birth date and the Social Security number or the name,
13  the Social Security number, something there needs to be
14  two pieces of ID that match?
15      A.  To respond and to verify, yes.
16      Q.  Right.  That's that No. 1 that you talked
17  about?
18      A.  Correct.
              [English, pgs. 146-47]

MBNA's Jennifer Carl also confirmed that matching two identifiers was MBNA's method for "verifying" information in response to a consumer's dispute.  [Carl, pg. 25]

MBNA testified that because it found Gail Cope's name and Social Security number in its system, it was justified in "verifying" that Rachel's bad debt should be reported to Gail's credit report.  [English, pg. 38]

The other piece of data that MBNA relied upon was the "ECOA Code" (No. 2), indicating that Rachel's account was a joint account with Gail, making Gail responsible for paying it.  As MBNA testified: "We verify that it's reporting accurately, yes.  We investigated that it was reporting as a joint account, *as we have it on our system*."  [Emphasis added] (English, pg. 38)

Had MBNA carefully considered Mrs. Cope's dispute, and truly investigated it, then MBNA would have realized that the very information in its system that it was relying upon was inaccurate in the first place and was causing the inaccuracies in Mrs. Cope's credit reports.  Yet MBNA appears to assume that its "system" is flawless and that the existence of the "joint account" notation in the MBNA system actually makes it true, and allows MBNA to disregard the core of Mrs. Cope's dispute.

In order to adequately investigate a dispute like Ms. Cope's, MBNA, needed to carefully consider the nature of her dispute (e.g., account belonged to daughter, not her).  Then it needed to take investigative steps that were reasonably calculated to determine whether the dispute was valid and whether a correction was needed.  One reasonable step would be to review the original application or other documentation connected to the account in question.  This would have shown that there was no documentation legitimately connecting Ms. Cope to her daughter's *current* account.  In fact, in response to one of Mrs. Cope's direct disputes to MBNA, an MBNA employee actually searched for, and found no documentation, and recommended that her name be removed.  But that recommendation apparently was overruled by an MBNA higher up.

Another step would have been to contact Ms. Cope, as her explanation and supporting details might have convinced MBNA to correct the data in accordance with Ms. Cope's wishes.

The problem is that MBNA did not take these or any other reasonable investigative upon

15

receiving the ACDV from the credit reporting agency because of its principle reliance on the ACDV data-comparison approach.   Accordingly, it was unlikely that MBNA would have even noticed that the only employee who actually did some investigation recommended the removal of Mrs. Cope's name, as MBNA' obsession with matching two identifiers would have caused it to overlook, or even disregard such information, in my opinion.

### G.    MBNA Caused the Problem By Inaccurately Labeling Mrs. Cope As Responsible for Her Adult Daughter's Credit Card

Clearly, the question of whether Mrs. Cope was ever a "guarantor" or "co-applicant" on Rachel's credit card is an issue for the jury to decide.  However, because the issue is potentially important to a portion of my opinion, I feel it is appropriate to make a few observations.

To summarize, in my opinion, MBNA caused the initial problem by inaccurately recording Gail Cope as a guarantor/co-applicant and then reported that inaccuracy to the credit reporting agencies.  My opinion is based upon what I found to be compelling testimony by Mrs. Cope and Rachel that Rachel applied for her MBNA card independently and did not involve her mother. Here is how Mrs. Cope testified:  (Q = MBNA, A= Gail Cope)

Q.    Was there a specific reason why you waited until they reached the age of 18 before removing them as authorized users?
A.    Yes. When they are 18, they are adults, and they had the opportunity of getting their own credit card.  When they are 16 or 17, they don't. (Gail Cope, pgs. 55-56)

Here is how Rachel Cope testified:   (Q = MBNA, A= Rachel Cope)

Q.         Fair enough.  Was there a particular reason why you decided to go with an MBNA card?
A.    Well, when I was younger, you know, 14 to 16 -- or 16 to 18 -- sorry -- I had a card that was an extension of my parents' card, and  they had it with MBNA.  So when I turned 18 and wanted my own, I just went with MBNA.
14    Q.    Okay.  When you say extension of  your parents' card, what do you mean by that?
16    A.    I was an authorized user on their  account.
Q.    Okay.  Now, the new card that you applied for, that's the card that's at issue in 20  this lawsuit.  Correct?
21    A.    Correct.
22    Q.    Do you recall how you applied for this MBNA card?
24    A.    I called them.
25    Q.    Okay.  Now, why did you decide to call them?  Did you get a solicitation letter or solicitation call?
3     A.    No.  When I turned 18, I wanted to start building my credit, or whatever, and have my own credit card.
6     Q.    So you just on your own initiative called MBNA?

8    A.    Right.

9    Q.    Do you recall how you got the phone number?

11    A.    Well, since we are already -- my parents had an account with them, I probably got it from them.    [Rachel Cope, pgs. 79-80]


15    Q.    Do you recall if they asked for your mother to get on the line?

17    A.    I know that she didn't get on the line regarding this matter.

19    Q.    Okay. How do you know that?

20    A.    Because I don't even think my mom knew much about what I was doing. I mean, I was getting a card for myself, and so I didn't really involve her.

24    Q.    But do you know if perhaps MBNA called back and talked to your mother at some point?

2    A.    If they had, then I would remember that.

4    Q.    How would you remember that?

5    A.    Because then I would know she was linked to my account.

7    Q.    Because you said you don't recall much about the conversation, that's why I'm --

9    A.    To my recollection, I applied for the card. It had nothing to do with my mother. [Rachel Cope, pgs. 82-83]


This testimony, coupled with the absence of credible documentation offered by MBNA showing that Gail Cope consented to being associated with this card, leads me to the opinion that MBNA, not Gail Cope, was responsible for associating Mrs. Cope with Rachel's card. In other words, MBNA created the problem and then perpetuated it in the credit reporting system, in my opinion.

If someone still thought that Mrs. Cope *might* have been involved with the issuance of the 1994 card, those doubts should have been erased in the March-April 2000 time frame. It was then that MBNA closed Rachel's Visa card (Acct. No. 4313 0228 7401 2543) and transferred the balance to a new MasterCard (acct No. 5490 9915 8600 0065).

Moreover, in October 1999, MBNA removed Gail Cope's name from Rachel's monthly billing statements. For the next 18 months, the billing statements were sent only in Rachel's name, to Rachel's addresses in Utah or Italy – and not to Gail Cope's address. [Gail Cope Deposition Exhibit 5]

MBNA has produced no documentation showing that Mrs. Cope was even notified of this, much less that she consented to it. This leads me to the firm opinion that this was Rachel's card and her mother had nothing to do with it. Accordingly, MBNA was responsible for all inaccuracies associated with the mixing of Rachel's account on to Mrs. Cope's credit report. Moreover, had MBNA conducted at true investigation upon receiving the ACDV from the CRAs, it should have uncovered this evidence, realized that Mrs. Cope was not responsible, and facilitated correction of her credit report.

**H.   Like Many Creditors, MBNA Looks At Credit Reporting As an Arm of Debt Collection**

Defendant MBNA is keenly aware that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms." (Rivera v. Bank One, 145 F.R.D. 64, 623 (D.P.R. 1993)). MBNA likely does what other creditors do when attempting to collect unpaid debts from customers and ex-customers: it warns them that if they don't pay their debts, it will negatively affect their credit worthiness as reflected on their credit reports.

When a consumer applies for a mortgage, or other major form of credit, the mortgage or credit often is not granted until all outstanding unpaid debts listed on the credit report are resolved. Thus, a creditor that is owed money, or that still hopes to collect money whether or not it is actually owed by the consumer, enhances its ability to garner payment by reporting the debt to that consumer's credit report. This practice his highly problematic and damaging to the consumer when the consumer in fact does not actually owe the amount being reported to his credit report. However, it is conceivable that such practices would cause consumers, particularly those who did not know their rights, to consider paying off debts that they did owe in order to remove serious derogatory data from their credit reports.

As I wrote in my book, "Credit Scores and Credit Reports,"

… Creditors view credit reporting as an arm of debt collection – a sort of last resort that will catch up with non-paying consumers sooner or later. This practice "crosses the line" when creditors and collectors threaten to report debts – or actually report debts – that they know or should know are not the responsibility of the consumer. [Page 31 – Second Edition]

In my opinion, MBNA continued to associate Mrs. Cope with Rachel's account because doing so would increase the likelihood of collecting the unpaid debt. MBNA also considered the credit report as its primary tool for making this happen.

**I.   MBNA Pays Minimal Attention to The Oversight of its Personal Data and Auditing its Accuracy**

Jennifer Carl testified that MBNA has between 40 to 60 million account holders. Her testimony about its approach to data oversight indicated at least a couple of potential problems. First she testified that MBNA essentially defines credit report accuracy as having MBNA's records mirror the CRA's records. However, there are instances, like the case of Mrs. Cope's, where the data are inaccurate in both the creditor's records and CRA's records, even though they mirror each other. Checking for discrepancies between MBNA's records and the CRA's records is a logical step in an accuracy-audit process, but by no means is adequate as a predominant step to the exclusion of other steps.

Second, its efforts to audit the accuracy of some 50 million records are limited to examining 250 to 300 customer records per year by two of Ms. Carl's staffers. This is not a sufficiently representative sample, in my opinion. Third, and possibly most troubling, is that

18

even when MBNA finds errors in the sampled customer files, it does little in the way of follow up to determine if there were systematic causes for the inaccuracies, according to Ms. Carl's testimony.  In my opinion, Ms. Carl's testimony underscored MBNA's disregard for the importance of overseeing and ensuring data accuracy.

Thus, in my opinion, the little that MBNA actually does to oversee and ensure data accuracy is in sharp contrast MBNA's "Purpose" statement that "MBNA adheres to a policy of reporting accurate and complete account information to the national credit reporting agencies… " [Exhibit 28, "Credit Bureau Information," Policy 62P]

# Evan D. Hendricks
**CURRICULUM VITAE**

**Professional Activities**

1981- Present        **Editor/Publisher** of ***Privacy Times***

   Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present        Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present        Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – Present    Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsiders view on credit reporting, marketing and other privacy issues.

**July – October 2002        Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

Evan Hendricks        P.O. Box 302        Cabin John, MD 20818
**(301) 229 7002  (301) 229 8011 [fax] evan@privacytimes.com**

---

**Testimony Before Congress & The FTC In 2003**

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003

Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do (Privacy Times, 2004)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act (Campaign For Political Rights, 1982)

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)
The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)
The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)
The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).

In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.

**Recent CLE & Professional Seminars**

"The New FACT Act: Challenge & Opportunity," Privacy & American Business, Feb. 9-10, 2004
"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process,"
Glasser LegalWorks, Sept. 28-29. 2004
"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005
"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute,
February 28- March 1 (New York City) and May 19-20 (San Francisco)

**Professional Societies**

Past President and Board Member, American Society of Access Professionals
www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996,
I am quoted regularly by major and small newspapers (including *The Washington Post, New
York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek* and *Money
Magazine*), regarding issues of privacy generally and the privacy implications of consumer
reporting specifically.  I have appeared on ABC Nightline and World News Tonight, NBC
Nightly News, CBS Evening News, CNN News Watch, and such shows as the Oprah Winfrey
Show and Geraldo, regarding a wide range of privacy issues

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)